IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:10-CR-112 |
| | ) | |
| MICHAEL E. ROBINSON, | ) | (VARLAN/SHIRLEY) |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case came before the Court on December 8, 2010, for an evidentiary hearing on the Defendant's Motion to Suppress [Doc. 17]. Assistant United States Attorney Kelly A. Norris appeared on behalf of the Government. Attorney Linda Rosillo Mulligan represented Defendant Robinson, who was also present.[1] The parties presented testimony and argument on the pending motion. On December 14, 2010, the Government filed a notice [Doc. 24], clarifying the testimony of one of its witnesses. The transcript of the evidentiary hearing was filed on January 11, 2011. At this time, the Court took the motion, the testimony, and the parties' arguments under advisement.

---

[1]Codefendant Monica Denton was also present with Attorney Kim A. Tollison, but Defendant Denton has not joined in the instant motion.

1

# I. POSITIONS OF THE PARTIES

The Defendant stands charged [Doc. 1] with the robbery of the Waffle House in Dandridge, Tennesseee, a business affecting interstate commerce (Count One), and with brandishing a firearm in relation to this robbery (Count Two). Both counts are alleged to have occurred on September 20, 2010. The Defendant argues [Doc. 17] that the police violated his rights under the Fourth Amendment because they did not have probable cause to stop a truck in which he was a passenger on September 20, 2010. He also contends that even if the truck was properly stopped, the officers did not have probable cause to search his person or to arrest him. Finally, the Defendant asserts that statements taken from him that night violate the Fifth Amendment because he was not provided the <u>Miranda</u> warnings.

The Government responds [Doc. 20] that the Defendant's Fourth and Fifth Amendment rights were not violated. It argues that the truck in which the Defendant was a passenger was properly stopped for speeding. It contends that the truck was properly searched pursuant to the automobile exception because the police had probable cause to believe that the Defendant had robbed the Waffle house and that the truck would contain evidence of the robbery. Additionally, the Government states that the officers could properly conduct an inventory search of the truck because it was immobilized during the stop and had to be impounded. It maintains that the Defendant's person was properly searched incident to his arrest and that the officers had reasonable suspicion to believe that the Defendant was armed. Finally, the Government asserts that the Defendants statements are admissible because they were either spontaneous utterances or were made after the Defendant was advised of his <u>Miranda</u> rights.

## II. FINDINGS OF FACT

At the December 8, 2011 suppression hearing, the Government presented the testimony of two witnesses: Dandridge Police Department (DPD) Officer Shane Hanshew and DPD Detective Lieutenant Kenneth Lodwick. Based upon their testimony, the exhibits presented at the hearing, and the supplemental exhibit [Doc. 24-1] filed by the Government, the Court makes the following findings of fact:

At 2:21 a.m., on September 20, 2010, Officer Hanshew received a radio dispatch that an armed robbery had just occurred at the Waffle House. [Tr. at 9]  At that time, Officer Hanshew and his partner, DPD Officer Josh Rigsby, who was in a separate patrol car, were one-half mile from the Waffle House and proceeded directly to that location.  [Tr. at 10] The central dispatcher told the officers that the robber was a black male wearing camouflage and sunglasses, carrying a yellow bag, and armed with a handgun. [Tr. at 10] The report stated that the robber was heading in the direction of the KFC and the Justice Center on foot.  [Tr. at 21, 38]  Upon his arrival at the Waffle House, Officer Hanshew saw a newer model Chevrolet Colorado pickup truck pull out from a side access road beside the Waffle House.  [Tr. at 9, 11, 13]  Officer Hanshew stated that the truck caught his attention because the access road does not lead to any homes or businesses and is rarely used, the truck pulled out quickly from the direction in which he had been advised that the robber was running, the truck did not have its lights illuminated when it pulled out of the access road, and the truck did not pause to yield to traffic before it pulled out.  [Tr. at 13]  Officer Rigsby, who was traveling in front of Officer Hanshew, activated his emergency lights, and the truck sped away.  [Tr. at 10, 14]

Officer Hanshew received a dispatch that a caller had stated that the robber was

behind a brick wall at the Waffle House,[2] and Officer Hanshew stopped in the median by the Waffle House for approximately fifteen seconds to await confirmation of that information. [Tr. at 14, 21, 43] Officer Hanshew decided that there was a time lapse between the call and the dispatcher's radio broadcast and caught up to Officer Rigsby and the truck. [Tr. at 14-15, 43] While pursuing the truck, the officers' emergency lights were activated, and the officers traveled at speeds of 70, 85, and 100 miles per hour, which exceeded the speed limit on those roads. [Tr. at 15-16] During the nine-minute pursuit, Officer Rigsby radioed that the occupants threw an object, which looked like a handgun, from the truck. [Tr. at 16, 46] Law enforcement officers from other jurisdictions joined the pursuit as it continued over ten miles from Jefferson County into Cocke County. [Tr. at 17, 46-47, 74] Newport City and Cocke County officers laid a "spike strip" on the road at the Cocke County line, and the truck drove over the spike strip, puncturing its tires. [Tr. at 18, 47-48]

When the truck came to a stop, approximately fifteen to twenty officers converged on the truck with their guns drawn. [Tr. at 17, 23, 47, 54] The officers yelled to the occupants to show their hands. [Tr. at 23] The driver and the front seat passenger got out of the truck unassisted, were handcuffed, and were taken into custody for leading the police on a high-speed chase and their perceived involvement in the robbery. [Tr. at 23, 49-50] An officer yelled that another occupant, who was later identified as the Defendant Michael Robinson, remained in the back seat of the truck. [Tr. at 24] The Defendant, who was wearing a camouflage jacket, dark-colored jeans, and a ball cap, was ordered out of the truck, but he did not comply. [Tr. at 24-25, 51] Then, an officer grabbed the Defendant and pulled him from the rear passenger's side of the truck. [Tr. at 24-25, 48] Although

---

[2]Officer Hanshew acknowledged that another 9-1-1 caller had stated that the police were going in the wrong direction, but he said that he was not aware of that call at the time he pursued the truck and Officer Rigsby. [Tr. at 44, 62]

none of the officers had asked him any questions, the Defendant said, "Don't beat me. I done it." [Tr. at 25] None of the officers hit the Defendant, although some may have still had their guns pointed at him. [Tr. at 25, 66] The Defendant was arrested for the robbery of the Waffle house and handcuffed as he lay on the ground. [Tr. at 25, 51-52] Officers Hanshew and Rigsby placed the Defendant in the back of Officer Hanshew's patrol car. [Tr. at 25, 55]

Officer Hanshew stood beside the opened back door of his patrol car and read the Miranda rights to the Defendant from a printed card. [Tr. at 26] At this point, no officers were yelling, none had their gun drawn, and the scene of the stop was "calm." [Tr. at 27] The Defendant told Officer Hanshew that he understood his rights and that he wanted to talk. [Tr. at 26, 68] Officer Hanshew asked the Defendant what had been thrown from the truck, and the Defendant responded that it was "weed." [Tr. at 27, 66] The Defendant also said that Officer Hanshew had him and the gun and asked what more did he want. [Tr. at 27, 66] Officer Hanshew thought that the Defendant appeared to be under the influence of narcotics at the scene of the stop, but he testified that he was certain that the Defendant understood his rights and voluntarily gave the statement. [Tr. at 69-70, 74]

At 2:30 a.m., Detective Lodwick received a radio dispatch that an armed robbery had occurred at the Waffle House, that two officers were in pursuit of a vehicle from that location, and that the robber was wearing a camouflage jacket, a hat, and sunglasses, and carrying a yellow bag and a handgun. [Tr. at 80, 93] Detective Lodwick arrived at the scene at 2:45 a.m., about five to ten minutes after the truck was stopped. [Tr. at 28, 93] At the time of Detective Lodwick's arrival, the three occupants of the truck had been taken into custody, and the Defendant was already seated in the back of Officer Hanshew's patrol car. [Tr. at 28, 80] Detective Lodwick also stood by the opened

car door and spoke with the Defendant. [Tr. at 29, 82] Detective Lodwick identified himself. [Tr. at 82] The Defendant confirmed that he had already been advised of his rights, but Detective Lodwick read him the <u>Miranda</u> rights again from a printed card. [Tr. at 83] Officer Hanshew overheard Detective Lodwick read the <u>Miranda</u> rights to the Defendant. [Tr. at 28] The Defendant told Detective Lodwick that he understood his rights. [Tr. at 83, 95] Detective Lodwick asked the Defendant what had happened, and the Defendant said that he did it and that he had acted alone. [Tr. at 83] Detective Lodwick asked the Defendant if he had robbed the Waffle House, and the Defendant responded that it was him. [Tr. at 95] The Defendant did not answer Detective Lodwick's question about the gun found in the truck. [Tr. at 83, 95] Detective Lodwick testified that during their one to two minute conversation, the atmosphere was calm and the Defendant seemed coherent. [Tr. at 84]

Detective Lodwick determined that the truck would be seized and impounded because it was disabled and was used in the commission of a crime. [Tr. at 85. 99-100] After speaking with the Defendant, Officer Hanshew joined with other officers at the scene in conducting an inventory search of the truck, which was stopped in the road partially blocking the intersection. [Tr. at 29, 34] Officer Hanshew testified that because the truck was immobilized and partially blocking the road, DPD policy required that it be impounded. [Tr. at 29, 57] Detective Lodwick and Officer Hanshew identified a copy of DPD policy regarding persons arrested in vehicles, which stated that an inventory would be conducted on all vehicles that were towed. [Tr. at 31, 86, Exh. 4A] During the inventory search of the truck, Officer Hanshew found a yellow shirt tied to form a bag on the floorboard of the backseat. [Tr. at 33, 73, Exh. 4C] A loaded handgun was recovered from the back seat floorboard, partially under the driver's seat near the Defendant's feet when he was in the truck.

[Tr. at 32-33, 35, 63-64, Exh. 6] Cash was recovered from the front floorboard and the Defendant's person. [Tr. at 59]

Defendant Robinson was transported from the scene to the Dandridge Police Department, where he was interviewed by Detective Lodwick in a conference room at 4:15 a.m. [Tr. at 35, 86] At the beginning of the interview, Detective Lodwick reviewed a rights waiver form with the Defendant, going over each of the rights listed. [Tr. at 87] The Defendant placed his initials after each sentence on the waiver form to show that he understood those rights and then signed the waiver. [Tr. at 87, Exh. 7] Detective Lodwick wrote out the Defendant's statement, which Lodwick described as rambling, as the Defendant gave it. [Tr. at 90, 97] The Defendant described how he encountered Monica Denton that day and how he came to be in her truck. [Exh. 7] Detective Lodwick said that he attempted to establish a chronology of where the Defendant had been that day, but the Defendant became agitated, accused Lodwick of putting words in his mouth, and said he was ending the interview, which had lasted fifteen to twenty minutes. [Tr. at 91, 98] At that time, Detective Lodwick had Officer Hanshew take the Defendant to the Sheriff's Department. [Tr. at 91] During the interview, Detective Lodwick was aware that the Defendant had attended school through the eighth grade and had several prior felony convictions. [Tr. at 92]

After Detective Lodwick interviewed the Defendant, Officer Hanshew transported the Defendant to the Jefferson County Justice Center. [Tr. at 36] During the drive, Officer Hanshew spoke with the Defendant again and asked him why he had thrown drugs from the truck during the pursuit and not the gun. [Tr. at 36] The Defendant responded, "You know." [Tr. at 36, 70] Officer Hanshew asked the Defendant if he had planned to use the gun. Officer Hanshew testified that the Defendant responded, "Yeah, I was going to shoot y'all especially if you started shooting at me, I

knew I was going to prison for a long time so I was going to make it bad." [Tr. at 36, 70-71] While in Officer Hanshew's presence, the Defendant did not ask for food or drink, state that he was uncomfortable, or ask to sleep. [Tr. at 36-37]

## III. ANALYSIS

The Defendant argues that law enforcement's conduct during the early morning hours of September 20, 2010, violated his rights under the Fourth and Fifth Amendments. Specifically, he contends that officers lacked probable cause to stop and to search the truck in which he was a passenger and lacked probable cause to arrest him or to search his person. He also argues that four of the five statements attributed to him that morning must be suppressed because, if made, they were made without the benefit of the Miranda warnings. The Court will address each of these arguments in turn.

### A. Stop, Arrest, and Searches

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. A warrantless search is presumed unreasonable "unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement." Flippo v. West Virginia, 528 U.S. 11, 13 (1999). The Court will examine whether the officers (1) had a valid basis to stop the truck in which the Defendant was a passenger, (2) could properly arrest and search the Defendant, and (3) could properly search the truck.

*(1) Stop of the Truck*

If an "officer has probable cause to believe that a traffic violation has occurred or was

occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. Ferguson, 8 F.3d at 392 (citing Illinois v. Gates, 462 U.S. 213, 244 n.13 (1983)).

Although the Defendant argues that the officers had no basis to suspect that the truck was associated with the robbery of the Waffle House when they saw it pull out of the access road, he concedes that the officers could properly stop the truck for speeding [Doc. 17 at 5; Tr. at 112], if such a violation was proven. At the evidentiary hearing, Officer Hanshew testified that he pursued the truck in which the Defendant was a passenger for ten miles, during which the truck was traveling at speeds of 75 to 100 miles per hour. This testimony is corroborated by the audio recording of the officers' radio conversations during the pursuit of the truck, on which the officers can be heard calling out the speeds at which they were traveling. Officer Hanshew testified that these speeds were well in excess of the posted speed limits on the roads upon which the truck traveled. The truck never submitted to the officers' attempt to pull it over but, instead, only stopped after driving over a spike strip and puncturing its tires. The Court readily finds that the officers had probable cause to stop the truck in which the Defendant was a passenger for speeding.


*(2) Arrest and Search of the Defendant*

The Defendant next argues that, while the officers might have had reason to question or to arrest the driver of the truck for speeding, they had no basis, much less probable cause, to arrest

him when they pulled him from the truck. The Defendant contends that because he was illegally arrested, the search of his person also violated the Fourth Amendment.

An officer may arrest an individual if the officer has probable cause to believe the person has committed or is committing a felony based upon the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 230-31 (1983); United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996). As discussed above, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," Bennett, 905 F.2d at 934.

In the present case, at the time that the officers pulled Defendant Robinson from the truck, they were aware of the following circumstances: At approximately 2:20 a.m., a black male wearing camouflage and sunglasses and carrying a yellow bag, had robbed the Waffle House with a handgun and fled on foot in the direction of the Justice Center. The officers arrived at the Waffle House within a minute[3] of the dispatch and saw a truck pull out from a little-used side road by the Waffle House. The truck pulled out quickly without pausing to yield to traffic and did not have its lights illuminated. When the officer in the lead patrol car activated his emergency lights, the truck sped away, proceeding to lead the officers on a ten-mile, high-speed chase through two counties. During the course of the pursuit, the occupants of the truck threw something out. The pursuit ended when the truck was disabled by driving over a spike strip. The Defendant, who was in the backseat, did not comply with the officers' commands to get out of the truck, and an officer pulled him from the truck. The Defendant was wearing a camouflage jacket and a yellow cloth was visible on the floorboard of the backseat. Upon being pulled from the truck, the Defendant said, "Don't beat me.

---

[3]The audio and video recordings from Officer Hanshew's patrol car reveal that the officers arrived at the Waffle House within one minute of receiving the initial dispatch of the robbery.

I done it."

        The Court finds that based upon the totality of the above circumstances the officers had probable cause to believe that the Defendant had robbed the Waffle House. Although the officers did not have a description of a vehicle involved in the robbery and, in fact were told that the robber had fled on foot, the truck emerged from a deserted side road beside the Waffle House within minutes of the robbery. Officer Hanshew testified that there were no homes or businesses on this side road and that he had almost never seen a vehicle on this road. In addition to the fact that the truck was exiting a deserted road immediately after the robbery, it appeared to be attempting to exit covertly because it pulled out quickly, without pausing for traffic, and did not have its lights illuminated. Finally, upon encountering the police, the truck sped away. This behavior cause the officers to at least reasonably suspect that the occupants of the truck were involved in the robbery.

        The Defendant argues that the officers had other information that suggested that the truck was not involved in the robbery, specifically the information that the robber was fleeing on foot and the dispatch received by Officer Hanshew upon his arrival at the Waffle House that the robber was by a brick wall behind the Waffle House.[4] Viewing this information along with the proximity and manner of driving of the truck, the Court still concludes that officers' observations allowed them to suspect reasonably that the truck was involved in the robbery. Officer Hanshew explained that he decided to follow the truck, despite receiving the dispatch about the robber being behind the wall, because there was sometimes a delay between the dispatcher's receipt of a 9-1-1 call and the radio

---

[4]The Defendant also argues that a 9-1-1 caller stated that the police were following the wrong vehicle and were headed in the wrong direction. Officer Hanshew testified that the officers pursuing the truck were never made aware of this call, so the Court does not consider it in weighing the totality of the circumstances known to the officers.

dispatch relaying the information from the call.  The fact that the arrival of the officers at the Waffle House and their observation of the truck both occurred within minutes of the robbery corroborated Officer Hanshew's explanation.

Returning to the examination of the circumstances known to the officers at the time of the Defendant's arrest, the officers saw that the Defendant met the description of the robber, as he was a black male wearing camouflage, when they approached the truck.  Immediately upon removing the Defendant from the truck, the officers could see a bright yellow cloth item in the rear floorboard where the Defendant's feet had been.  These circumstances, considered along with the truck's proximity to the Waffle House and the covert and erratic driving of the truck, gave the officers probable cause to believe that the Defendant was the robber and to arrest him for the robbery of the Waffle House.

The Defendant first objects to his removal from the truck, contending that the officers only had cause to question or arrest the driver.  The Supreme Court has held that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."  Maryland v. Wilson, 519 U.S. 408, 415 (1997).  The Defendant also asserts that the description of a black male wearing camouflage is simply too generic for his appearance to add anything to the probable cause equation.  While the fact that the Defendant matched the basic description of the robber might have alone been lacking, his flight from the police immediately after the robbery and his proximity to the yellow bag gave the officers reasonable grounds for their belief that the Defendant was the robber.

In sum, although the Court need only find that the officers had reasonable suspicion to pursue the truck initially, when officers receive a dispatch of a robber at 2:20 a.m., arrive at the scene approximately one minute later, and observe a vehicle, in close proximity to the scene,

erratically pull out from a side street, without yielding to traffic and without its headlights illuminated, and when the vehicle immediately fails to yield to emergency lights and, instead, takes off, leading officers on a high speed chase at speeds up to 100 miles per hour, the undersigned finds that the officers have probable cause to believe that the occupants of the vehicle were involved in the robbery. Additionally, when the vehicle is only stopped by the use of a spike strip, the Defendant matches the description of the robber, and the Defendant refuses to exit the vehicle, the probable cause to arrest the Defendant only increases.

Upon his arrest, the officers could properly search the Defendant's person. See Chimel v. California, 395 U.S. 752, 762-63 (1969) (holding that a defendant may be searched incident to an arrest without violating the Fourth Amendment). Although the Court did not hear any testimony regarding the search of the Defendant's person, the Court assumes that it occurred at the scene because Officer Hanshew testified that currency was found on the Defendant.

*(3) Search of the Truck in which the Defendant was a Passenger*

The Defendant also argues that the officers had no basis for the warrantless search of the truck at the scene of the stop. The Government contends that the truck was properly searched pursuant to two exceptions to the warrant requirement: (a) the automobile exception and (b) the inventory search exception.

*(a) automobile exception*

The automobile exception to the warrant requirement provides that "[i]f there is probable cause to believe that a vehicle contains evidence of criminal activity," an officer may search "any area of the vehicle in which the evidence might be found." Arizona v. Gant, 129 S. Ct. 1710,

1721 (2009) (citing United States v. Ross, 456 U.S. 798, 820-21 (1982)); United States v. Mans, 999 F.2d 966, 969 (6th Cir.) (when "police have probable cause to believe that a vehicle contains contraband, they may search the entire vehicle and any contents located within it"), cert. denied, 510 U.S. 999 (1993). The mobility of an automobile as well as the reduced expectation of privacy stemming from the fact that automobiles are highly regulated gives rise to this automobile exception to the warrant requirement. Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). As long as the vehicle is mobile and police have probable cause to believe that it contains evidence of the crime, no exigent circumstances need be present. Id.; see also Maryland v. Dyson, 527 U.S. 465, 466-67 (1999); United States v. Cope, 312 F.3d 757, 775 (6th Cir. 2002).

In the present case, the Court finds that the same circumstances that provide probable cause to believe the Defendant was the robber also provide probable cause to believe that the truck would contain evidence of the robbery of the Waffle House. These circumstances, discussed at length above, include the proximity of the truck to the Waffle House immediately after the robbery, the covert and erratic manner in which the truck pulled out from the side road, the fact that the truck fled upon encountering the police, the fact that the Defendant met the basic description of the robber, and the fact that some evidence of the robbery (the yellow bag and currency) was in plain view upon the occupants' exiting the truck. Although the Court finds that the probable cause requirement of the automobile exception is readily met, the mobility of the vehicle is another matter. At the time the truck was searched, its tires were blown out and the truck was inoperable. Officer Hanshew and Detective Lodwick characterized the truck as disabled.

The Government cites to case law from the Sixth Circuit to argue that although the inherent mobility of automobiles justifies the automobile exception to the warrant requirement, the

automobile itself does not have to be mobile for the exception to apply. United States v. Johnson, No. 92-1839, 1993 WL 106844, *7 (6th Cir. Apr. 9, 1993) (holding that "[t]he 'inherent mobility' of a car justifies a warrantless search, even if the car is in fact immobilized and exigent circumstances no longer exist"), cert. denied, 510 U.S. 903 (1993); see also United States v. Haynes, 301 F.3d 669, 678 (6th Cir. 2002) (observing that "even if the Firebird was not readily mobile, the lesser expectation of privacy in automobiles is an accepted justification for searching without a warrant, provided that there is probable cause"). In both of these cases, however, the vehicle was no longer readily mobile because the driver had been seized by the police, not because the vehicle itself was no longer operable. Haynes, 301 F.3d at 678 (examining the defendant's argument that the officers should have obtained a search warrant for his car because he was in custody); Johnson, 2009 WL 106844, at *7 (analyzing the defendant's contention that "since he was under arrest and the other individuals were outside the car, the agents were required to immobilize the car and obtain a search warrant").

The Sixth Circuit has also applied the automobile exception in a case in which the vehicle was inoperable at the time of the search. United States v. Rommann, No. 89-6042, 1990 WL 66823 (6th Cir. May 21, 1990), cert. dismissed, 497 U.S. 1057 (1990). In Rommann, the district court determined that the automobile exception did not apply because at the time the truck was searched, it was not "readily mobile" as it "was up on a jack with one wheel removed for repair of a flat tire." Id. at 81. The appellate court reversed, observing that although the "ready mobility" of vehicles initially justified the establishment of an automobile exception to the warrant requirement, the Supreme Court's later cases show that the lesser expectation of privacy in vehicles is a second basis supporting the application of the automobile exception:

We do not think the automobile exception to the warrant requirement should turn on the condition of the vehicle or whether, as a practical matter, it could be spirited away from the police before a search could be completed. Considerations of factors of this nature would just add more uncertainty as to what is permitted and what is prohibited. We believe the Supreme Court has moved to where the key inquiry is probable cause and, if that is present, most, if not all, auto searches will not require a warrant. It appears that the fact that an automobile is involved has subsumed in most fact situations any requirement for separate and distinct exigent circumstances.

Id. at *2-3; see also United States v. Markham, 844 F.2d 366, 368 (6th Cir.) (observing that "ready mobility" is not the sole justification for the automobile exception), cert. denied, 488 U.S. 843 (1988). In accord with these cases, the Court finds that the automobile exception applies to the search of the instant truck, even though it was not operable.

*(b) inventory search*

The Government contends that the search of the truck was also proper because officers may conduct an inventory search of a vehicle that is being impounded. It asserts that the truck had to be towed because it was immobilized and was partially blocking the road. Additionally, the Government contends that an inventory search was necessary for officer safety because the officers believe that the firearm used in the Waffle House robbery was located in the truck. The Defendant argues that an inventory search was unnecessary because the officers could have permitted the truck's owner to have the truck removed from the area, rather than impounding it. Moreover, he contends that the officers were not facing any safety risks because the occupants of the truck were already handcuffed and secured in separate police cruisers.

"[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." Colorado v. Bertine, 479 U.S. 367, 371 (1987). "After lawfully taking

custody of a vehicle, officers may conduct a warrantless inventory search.  Such inventory searches 'serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.'" United States v. Lumpkin, 159 F.3d 983, 987 (6th Cir. 1998) (quoting Bertine, 479 U.S. at 372).  An inventory search must be carried out according to standard police procedures.  Id.  In general, "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment."  Colorado v. Bertine, 479 U.S. 367, 374 (1987); Lumpkin, 159 F.3d at 987 (holding that although the inventory policy was not a part of the record, the officer's undisputed testimony was sufficient to show that the vehicle was searched in good faith pursuant to the standard procedures).  Although an inventory search cannot be conducted for the purpose of investigation, an officer's subjective suspicion that the vehicle contains contraband does not invalidate an inventory search that is otherwise proper.  Id.

In the present case, Officer Hanshew testified that department policy required that the truck be impounded because it was immobilized and partially blocking the road.  Detective Lodwick also testified that the truck had to be impounded because it was disabled and added that the truck was seized because it was used in the commission of a crime.  Both officers pointed to the requirement in the Dandridge Police Department policy [Exh. 3] that an inventory would be performed on all vehicles that were towed.

An inventory search must proceed pursuant to "standardized criteria" or "established routine" in order to protect against the use of inventory searches as "a ruse for a general rummaging in order to discover incriminating evidence."  Florida v. Wells, 495 U.S. 1, 4 (1990).  Part of the reasoning behind admitting evidence discovered in an inventory search is that such searches are part

of routine police procedures and, thus, not arbitrarily used as an investigative tool. See Bertine, 479 U.S. at 372-73. The Supreme Court has held that an officer may properly exercise discretion on whether to impound a car "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." Id. at 375; United States v. Kimes, 246 F.3d 800, 804 (6th Cir. 2001), cert. denied, 534 U.S. 1085 (2002). "The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment." Wells, 495 U.S. at 4. For example, in Bertine, the Court found the officer's discretion "was exercised in light of standard criteria, related to the feasibility and appropriateness of parking and locking a vehicle rather than impounding it." Bertine, 479 U.S. at 375-76. In Kimes, the court noted that the officers would permit the driver's relatives or friends to take the car if they were present or the driver could contact them and they could arrive promptly. Kimes, 246 F.3d at 804 (holding that the officers' discretion in conducting the inventory search did not defeat the inevitable discovery doctrine).

In the present case, the Dandridge Police Department Manual was made an exhibit at the evidentiary hearing.[5] Section 5.010 of the manual provides that

> [m]otor vehicles in the possession of arrested persons will initially be disposed of as requested by the arrested party, provided the disposition in reasonable, legal, and safe. The arresting officer will

---

[5]At the evidentiary hearing, Detective Lodwick testified that a portion of the DPD manual was blacked out because the manual was being revised. [Tr. at 85-86] Two weeks after the evidentiary hearing, the Government filed a notice [Doc. 24] clarifying Detective Lodwick's testimony on the blackened lines in Exhibit 3. The Government states that the lines are actually highlighted but appear as blacked out on the copy used as Exhibit 3. Accordingly, the Government informs the Court that the blacked out portions of Exhibit 3 are still in effect. The Court has reviewed the unmarked copy of the DPD manual provided by the Government as an exhibit to its notice and finds that the blackened lines in section 5.010 relate to the selection of a towing company and have no bearing upon the issues at hand.

18

assess the reasonableness of the requested disposition of the vehicle based on the facts he has. Should the requested disposition be unreasonable, illegal, or unsafe, the officer will request a tow truck for storage of the vehicle in the towing company's lot. . . . .

An inventory will be conducted on all vehicles towed.

[Exh. 3] Detective Lodwick testified that he decided that the truck would be impounded in part because it was being seized "due to the nature of the crime," explaining that the Dandridge Police Department attempts to conduct an asset forfeiture on "every vehicle . . . used in the commission of a major felony[.]" [Tr. at 85] On cross examination, Detective Lodwick testified that he does not give the arrested owner of a vehicle the opportunity to arrange to remove the vehicle themselves if the vehicle is being seized because it was used in a major crime. [Tr. at 100] Based upon this testimony, the Court finds that Detective Lodwick's determination to impound the truck comported with standard criteria or the established routine in the DPD policy. Because the truck was being seized for purposes of asset forfeiture, it was unreasonable to permit the arrested owner to move the truck. Moreover, the truck was inoperable and leaving it partially blocking the road in the nighttime would have been unsafe. Because the truck was impounded in compliance with the DPD's standard policy, the Court finds that the officers could properly conduct an inventory search of the truck.

Thus, the Court concludes that the warrantless search of the truck did not violate the Fourth Amendment as both the automobile exception and the inventory search exception apply in this case.

## B. Statements

The Defendant asks the Court to suppress four of the five statements that he is alleged

to have made during the early morning of September 20, 2010, because he contends that those statements, if made, were unwarned and involuntary in violation of the Fifth Amendment. The Government responds that the Defendant's statements are admissible because they were either spontaneous utterances or made after the Defendant received and waived his Miranda rights.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

The obligation to administer Miranda warnings to suspects only arises if there has been "such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). To determine whether an individual is in custody for purposes of Miranda, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. Salvo, 133 F.3d at 948; see also United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323; Mason v. Mitchell, 320 F.3d 604, 631 (6th Cir. 2003). The "'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Knox, 839 F.2d 285, 291 (6th Cir. 1988) (quoting California v. Beheler,

463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); <u>Swanson</u>, 341 F.3d at 529.

In the present case, the Court finds that the Defendant was pulled from the truck and immediately taken into police custody and arrested. Accordingly, all of the statements attributed to the Defendant are custodial. The following five statements are attributed to the Defendant: (1) "Don't beat me. I done it." said immediately after the Defendant was pulled from the truck, (2) a statement to Officer Hanshew while seated in the police car at the scene of the stop, (3) a statement to Detective Lodwick while seated in the police car at the scene of the stop, (4) a statement to Detective Lodwick made at the Dandridge Police Departement following the signing of a waiver form, and (5) a statement to Officer Hanshew while the Defendant was being transported to the Justice Center. Of these statements, the Defendant contests all but the fourth, the statement to Detective Lodwick at the Dandridge Police Department. Accordingly, the Court examines each of the other four statements in turn to determine whether the Defendant made the statement, whether he received the <u>Miranda</u> warnings, and whether he waived his <u>Miranda</u> rights and voluntarily gave the statement.

*(1) Statement upon removal from truck.*

Officer Hanshew testified that when the Defendant was pulled from the backseat of the truck, he said, "Don't beat me. I done it." [Tr. at 25, 65-66] The Defendant argues that he ever made this statement. [Tr. at 117] Additionally, he argues that if he made the statement, it should be suppressed because it was made involuntarily, without the benefit of the <u>Miranda</u> warnings and due to the coercive circumstances, which involve the Defendant being pulled from the truck by a police officer while surrounded by fifteen to twenty angry police officers who were yelling and pointing guns at him. Finally, he contends that the statement does not constitute an admission because it is

vague.  The Government argues that the statement was a volunteered, spontaneous utterance, for which no <u>Miranda</u> warnings were required.

With regard to whether the Defendant actually made the statement "Don't beat me. I done it." upon being pulled from the truck, the Court finds that he did.  Officer Hanshew testified that he was standing next to the truck, when the Defendant was pulled out by another officer and made that statement. [Tr. at 65] The Defendant presented no contradictory testimony or evidence. Although defense counsel cross-examined Officer Hanshew about the statement, the thrust of the cross-examination was about the circumstances under which the Defendant made the statement. Also, unlike with some of the other statements, defense counsel did not question Officer Hanshew about whether he included this statement by the Defendant in his police report.  Accordingly, the Court finds Officer Hanshew's testimony that the Defendant made this statement to be credible and unchallenged.

Second, the Court agrees with the Government that the <u>Miranda</u> warnings were not required for this statement.  Although the Defendant was in police custody, he did not make the statement in response to any interrogation from the police.  With respect to <u>Miranda</u> warnings, interrogation has been defined as "questioning initiated by law enforcement officers." <u>Miranda</u>, 384 U.S. at 444.  The duty to warn under <u>Miranda</u> arises in custodial situations "whenever there is 'express questioning or its functional equivalent.' " <u>United States v. Murphy</u>, 107 F.3d 1199, 1204 (6th Cir. 1997) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980)).  "Interrogation" under <u>Miranda</u> thus "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." <u>Innis</u>, 446 U.S. at 301.  "Custodial

interrogation includes 'words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to "have . . . the force of a question on the accused" . . . and therefore be reasonably likely to elicit an incriminating response.'" United States v. Clark, 982 F.2d 965, 968 (6th Cir. 1993) (quoting Pennsylvania v. Muinz, 496 U.S. 582, 601 (1990) (internal citations omitted)). "[W]here a defendant [in custody] makes a voluntary statement without being questioned or pressured by an interrogator," however, "the statements are admissible despite the absence of Miranda warnings." Murphy, 107 F.3d at 1204 (citing United States v. Montano, 613 F.2d 147, 149 (6th Cir.1980)).

In the present case, the officers did not ask the Defendant any questions when he was pulled from the truck. Moreover, the Court finds that the officers' conduct in surrounding the truck, yelling for the occupants to exit with their hands raised, and drawing their weapons were actions taken to effectuate the arrest of the occupants following a high-speed chase when the officers believed the occupants to be armed. The record is devoid of evidence that the officers took these actions in order to elicit an incriminating statement from the Defendant. Accordingly, the Court finds that the police were not required to advise the Defendant of his Miranda rights prior to pulling him from the truck.

The Defendant also seems to argue that even if no Miranda warnings were necessary, the statement "Don't beat me. I done it." was involuntarily made in response to the officers' conduct, rather than knowingly and voluntarily given. He contends that the statement "Don't beat me." itself reveals that the Defendant was afraid of the police. Officer Hanshew testified that none of the officers hit the Defendant and that the officer pulling the Defendant from the truck did not have his gun drawn. [Tr. at 25, 66] Although the Defendant likely felt frightened by the

circumstances, the Court finds that the law enforcement officers did not behave coercively in order to pressure the Defendant into confessing. See Colorado v. Connelly, 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"). Instead, the Defendant's statement "Don't beat me. I did it." was a spontaneous, voluntary utterance. "Volunteered statements of any kind are not barred by the Fifth Amendment[.]" Miranda, 384 U.S. at 478.

Finally, the Defendant argues that the statement "I done it" is vague and does not actually constitute an admission. The Court finds that the imprecise nature of the statement does not show that it was gained in violation of the Fifth Amendment, which is the issue before this Court. The question of whether the statement is admissible is the one before the Court. Whether the statement constitutes an admission of guilt will be for the jury to decide.

*(2) Statement to Officer Hanshew in patrol car.*

The Defendant next challenges the alleged statement to Officer Hanshew that he threw drugs from the truck and that the police had him and the gun, what more did they want. As with the other statements, the Defendant challenges whether he actually gave this statement and its voluntariness, if given.

Officer Hanshew testified that he and Officer Rigsby escorted the Defendant to Hanshew's patrol car and seated him in the back. [Tr. at 25, 55] Officer Hanshew stated that he stood beside the opened back door of the patrol car and read the Miranda warnings to the Defendant from a printed card. [Tr. at 26] Officer Hanshew characterized the scene at this point as "calm" and said that no officers were yelling or had their guns drawn. [Tr. at 27] The Defendant told Officer

Hanshew that he understood his rights and agreed to talk. [Tr. at 26, 68]  Officer Hanshew testified that he asked the Defendant what had been thrown from the truck and that the Defendant responded that it was "weed."  [Tr. at 27, 66]  The Defendant also said that Officer Hanshew had him and the gun and asked what more did he want.  [Tr. at 27, 66]  Officer Hanshew testified that the Defendant appeared to be under the influence of narcotics at the scene of the stop but that he was certain that the Defendant understood his rights and voluntarily gave the statement.  [Tr. at 69-70, 74] In this regard, Officer Hanshew stated that the Defendant appeared to understand what he was saying, spoke coherently and did not have slurred speech, and responded appropriately to questions. [Tr. at 74-75]

On cross-examination, defense counsel asked Officer Hanshew why he did not record this statement by the Defendant in his police report or on any record documenting the events of that morning.  At first, Officer Hanshew stated "I believe I wrote it down somewhere," but then he agreed that it was not in his report. [Tr. at 67] On redirect examination, he explained that he did not write down every relevant fact in his initial police report. [Tr. at 78]

Also, on cross-examination, Officer Hanshew stated that although he read the Miranda rights to the Defendant from a card, he did not have the Defendant sign a rights waiver. [Tr. at 68] Officer Hanshew said that he did not carry Miranda waiver forms with him and that "[u]sually, if it's something that involves a lot of questioning a detective comes out and does it," rather than the patrol officers. [Tr. at 68-69] Officer Hanshew testified that although he has a camera in his police car, he did not place the Defendant in front of the car to read him the Miranda warnings or to take his statement because the police were trying to secure the scene of the stop and he wanted to put the Defendant in the patrol car as soon as possible. [Tr. at 72]

The Court finds that the Defendant made the statement to Officer Hanshew that drugs

were thrown from the truck and that the police had him and the gun, what more did they want. The Court also finds that Officer Hanshew advised the Defendant of the <u>Miranda</u> warnings before asking him any questions. As with the first statement discussed above, the Defendant presented no testimony or evidence contradicting Officer Hanshew's testimony as to the actual making of the second statement or the advice of <u>Miranda</u> rights. As such, the testimony of Officer Hanshew was uncontradicted. Although defense counsel referred to a police report and other documentation that did not mention this second statement, these documents were not introduced into evidence. Even accepting that the second statement was not included in the police report, the Court cannot find that the mere omission of the statement from the police report is sufficient to overcome Officer Hanshew's affirmative testimony that he gave the Defendant the <u>Miranda</u> warnings and the Defendant made the statement.

While the Court has some concerns about the fact that Officer Hanshew apparently made no attempt to record the Defendant's <u>Miranda</u> waiver and statement when his car was equipped with a recording device, Officer Hanshew explained this lapse as resulting from the need to secure the Defendant in a police car as soon as possible. In light of the facts in this particular case, that the three occupants, whom the police believed to be armed and who had fled from the police, had just been removed from the truck, this focus on officer safety is warranted. Accordingly, the Court finds that the Defendant made the second statement after receiving and waiving his <u>Miranda</u> rights.

The Defendant also argues that the chaos of the scene, which included police officers yelling and drawing their guns, prevented him from voluntarily waiving his rights and making a statement. Even when the <u>Miranda</u> warnings are administered, the government must prove that the defendant voluntarily, knowingly, and intelligently waived those <u>Miranda</u> rights before it may

26

introduce an incriminating statement by a defendant. <u>Connelly</u>, 479 U.S. at 169-70. The government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence. <u>Id.</u> at 168.

To determine whether a confession was voluntary, the court must examine the following factors in light of totality of the circumstances: (1) whether the police conduct was objectively coercive, (2) whether the coercive police conduct was sufficient to overbear the defendant's will when viewed subjectively from the defendant's state of mind, and (3) whether the coercive police conduct was in fact the cause of the defendant's will being overborne. <u>McCall v. Dutton</u>, 863 F.2d 454, 459 (6th Cir. 1988). Circumstances relevant to whether the Defendant's will was overborne "include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." <u>Ledbetter v. Edwards</u>, 35 F.3d 1062, 1067 (6th Cir. 1994) (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)). As discussed above, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." <u>Connelly</u>, 479 U.S. at 167. "If the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed." <u>McCall</u>, 863 F.2d at 459 (citing <u>Connelly</u>, 479 U.S. at 163-64).

Turning to the first factor–whether the police conduct was objectively coercive–the Court finds the fact that the second statement was given in the rear of a patrol car indicates coerciveness:

The back seat of a patrol car is an inherently coercive setting for a

confession. Cf. Brewer v. Williams, 430 U.S. 387 . . . (1977). The prisoner and police officers are in close contact within a confined area. Often, the inside door handles are removed and the front and back seats are separated by wire mesh or a plastic divider. Invariably, the prisoner is handcuffed. He is effectively cut off from the world outside the patrol car. As a practical matter, he has no access to friends or counsel. If the prisoner has just been arrested, he may still be disoriented and apprehensive in an often hostile and alien setting. In short, the back seat of a patrol car as the setting for a confession conforms in all respect to the "incommunicado, police-dominated" atmosphere which led the Supreme Court in Miranda v. Arizona, 384 U.S. 436, 456 . . . (1966), to recognize the need for special procedures to minimize the inherent coerciveness of custodial interrogation. A confession made in such a setting, even where Miranda warnings are given, is suspect, and courts called on to determine its voluntariness must carefully sift the surrounding circumstances to discern any signs that the statement supposedly "volunteered" by a prisoner was actually obtained under duress.

United States v. Brown, 557 F.2d 541, 551 (6th Cir. 1977) (finding the fact that the defendant was handcuffed in the back of a patrol car when he gave the incriminating statement to be one factor showing that the circumstances were coercive). The other circumstances surrounding the second statement, however, do not show that the police conduce was objectively coercive. Although the Defendant had been recently surrounding by fifteen to twenty police officers who were shouting and pointing guns at him, at the time he received the Miranda warnings and made the second statement, only Officers Hanshew and Rigsby were near him. They were not seated in the car with the Defendant but stood in the open doorway. Officer Hanshew testified that the atmosphere of the scene was calmer at this point and that none of the officers had their weapons drawn. The record is devoid of evidence that the Defendant was ever hit or physically harmed in any way.

The Court next examines whether the police conduct was sufficient to overcome the Defendant's will, which the Court considers subjectively from the Defendant's viewpoint. See

McCall, 863 F.2d 459. The Defendant was fifty-one years old on September 20, 2010, as revealed by the Miranda waiver form [Exh. 7] that the Defendant later signed. Moreover, Detective Lodwick testified that the Defendant had several felony convictions. Although it appears that the Defendant has only had limited education,[6] the Court finds that the Defendant was mature and had considerable experience with the criminal justice system. The Defendant was given the Miranda warnings and agreed that he understood the warnings and that he wanted to talk to Officer Hanshew. The questioning by Officer Hanshew was short, lasting only a couple of minutes, and was not of a repeated or prolonged nature. Finally, there is no evidence that the Defendant was subjected to any physical punishment by the police. In light of this evidence, the Court finds that the coerciveness of the location of the interview was not sufficient to overcome the Defendant's will.

Lastly, the Court looks to "whether the coercive police conduct was in fact the cause of the defendant's will being overborne." McCall, 863 F.2d at 459. The Court finds no evidence that this was the case. Instead, the Court finds that the Defendant acted of his own free will in waving his Miranda rights and making the second statement. Accordingly, the Court finds that the statement was voluntarily given and should not be suppressed.

The Defendant also calls for the suppression of the second statement as involuntarily given because he was under the influence of narcotics at the time. Although the Defendant argues that he was under the influence of drugs, no proof of this claim was offered, and, further, this alone does not render his confession involuntary: "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself,

---

[6]The Miranda waiver form [Exh. 7] states that the Defendant reported an eighth-grade education.

sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." <u>United States v. Newman</u>, 889 F.2d 88, 94 (6th Cir. 1989); <u>see also</u> <u>United States v. Dunn</u>, 2008 WL 698940, at *4 (6th Cir. Mar. 17, 2008) (holding that defendant's assertion that he was under the influence of Vicodin and marijuana when he waived his rights did not render his statement involuntary in the absence of police coercion). Here, Officer Hanshew's unrebutted testimony at the evidentiary hearing reveals that the Defendant's potential consumption of drugs did not affect his ability to understand what Officer Hanshew was saying or to respond coherently and appropriately. Accordingly, the Court finds that even considering the possibility that the Defendant had recently consumed narcotics in combination with the coercive nature of the location of the statement, the Defendant was still able to voluntarily, knowingly, and intelligently make the second statement to Officer Hanshew while the Defendant was seated in the back of the police car.

*(3) Statement to Detective Lodwick in patrol car.*

The Defendant raises the same arguments with regard to his third alleged statement made to Detective Lodwick while the Defendant was seated in the police car. He argues that he did not make this statement, that he was not given the <u>Miranda</u> warnings before making it, and that it was not voluntarily made in light of the coercive circumstances and the fact that he was impaired by narcotics. The Court briefly submits these contentions to the same analysis that it used for the statement to Officer Hanshew above.

Detective Lodwick testified that he approached the Defendant while the Defendant was seated in the back of a police car, stood beside the opened car door, and identified himself. [Tr.

at 28, 80, 82] Although the Defendant affirmed that he had already received the <u>Miranda</u> warnings, Detective Lodwick testified that he read the <u>Miranda</u> rights to the Defendant again from a printed card. [Tr. at 83] Officer Hanshew testified that he overheard Detective Lodwick read the <u>Miranda</u> warnings to the Defendant. [Tr. at 28] Detective Lodwick testified that the Defendant said he understood his rights. [Tr. at 83, 95] Detective Lodwick asked the Defendant what had happened, and the Defendant responded that he did it and that he acted alone. [Tr. at 83]. When Detective Lodwick attempted to clarify this statement by asking if the Defendant had robbed the Waffle House, the Defendant responded that it was him. [Tr. at 95] Detective Lodwick then questioned the Defendant about the gun found in the truck, but the Defendant did not answer any questions about the gun. [Tr. at 83, 95] Detective Lodwick testified that his conversation with the Defendant lasted one to two minutes, that the atmosphere was calm, and that the Defendant seemed coherent and did not seem to be impaired. [Tr. at 84, 94]

On cross-examination, Detective Lodwick testified that he did not have the Defendant fill out a rights waiver form at the scene, even though Lodwick had a copy of the waiver in his car. [Tr. at 94] Detective Lodwick stated that while he reads defendants their rights from a printed card at the scene, he only has a defendant execute a rights waiver if he's talking with that defendant at his office or another secure location. [Tr. at 96] He explained that one reason for this personal policy was that he wanted to be able to look the defendant in the eye when he executed the waiver, while still being in a secure location, something that was difficult when seated in a police car with a handcuffed defendant. [Tr. at 96] Detective Lodwick agreed that if he had the Defendant sign a rights waiver at the scene, there would not be any dispute as to whether the Defendant waived his <u>Miranda</u> rights. [Tr. at 96] Detective Lodwick acknowledged that the Defendant said nothing incriminating

in his later statement made at the police department after executing a waiver form. [Tr. at 97]

Also on cross-examination, Detective Lodwick acknowledged that he made simultaneous handwritten notes of the Defendant's statement to him after he gave him the oral Miranda warnings at the scene. [Tr. at 100-01] He stated that he did not include the fact that the Defendant had admitted to robbing the Waffle House in his arrest report. [Tr. at 101] Detective Lodwick explained that he never included a defendant's statement in the arrest report. [Tr. at 101] Detective Lodwick stated that he also did not tell the news media that the Defendant had confessed to the robbery. [Tr. at 132]

The Defendant again challenges whether the statement to Detective Lodwick was made or the oral Miranda warnings given. The Court finds Detective Lodwick's positive testimony about these two events to be supported by Officer Hanshew's testimony that he heard Detective Lodwick give the Miranda warnings to the Defendant and by Detective Lodwick's documentation of the statement in his handwritten notes made close in time to the statement. Although having the Defendant execute a rights waiver or recording the oral waiver on the in-car recording system would have provided a clear record, the Court finds that the Defendant did not introduce any evidence to contradict Detective Lodwick's testimony. Thus, the Court finds that Detective Lodwick advised the Defendant of his rights under Miranda, that the Defendant affirmatively waived those rights, and that the Defendant made a brief statement in which he confessed to robbing the Waffle House alone.

The Defendant also contends that his statement to Detective Lodwick while he was seated in the police car was involuntary, despite his receipt of the Miranda warnings, because of the coerciveness of the circumstances and because he was under the influence of narcotics. The Court rejects this argument for the same reasons that it found that the second statement to Officer Hanshew

was voluntary, despite the coercive location of the statement, as discussed above. The Defendant's third statement followed closely behind the second statement, so virtually all of the circumstances were the same. Moreover, those circumstances that were different only enhance the finding that the statement was voluntary: The Defendant was only interacting with Detective Lodwick, he received the <u>Miranda</u> warnings for the second time, and Detective Lodwick did not believe him to be impaired. Accordingly, the Court finds that the Defendant's third statement given to Detective Lodwick while he was seated in the police car was voluntarily and knowingly made.

*(4) Statement to Officer Hanshew while en route to the jail.*

Finally, the Defendant argues that the Court should suppress the statement he allegedly gave to Officer Hanshew while he was being transported from the Dandridge Police Department to the Justice Center. He contends that he did not make this statement, that he did not receive the <u>Miranda</u> warnings before making it, and that it was not voluntarily and knowingly given.

The Defendant does not dispute that at 4:15 a.m. on September 20, 2010, he executed an Admonition and Waiver [Exh. 7] at the Dandridge Police Department and gave an un-incriminating statement to Detective Lodwick regarding when he had encountered his Codefendants and some of their actions that day. Detective Lodwick testified that the Defendant became agitated, accused Lodwick of putting words in his mouth, and ended this interview after approximately fifteen to twenty minutes. [Tr. at 91, 98] Detective Lodwick testified that at that point, he had the Defendant taken to Officer Hanshew, who transported the Defendant to the Jefferson County Justice Center. [Tr. at 91] Officer Hanshew testified that while he was transporting the Defendant to the Justice Center, he asked the Defendant "why he threw the weed out and not the gun." [Tr. at 36] Officer

Hanshew said the Defendant responded, "[Y]ou know." Officer Hanshew testified that he then asked the Defendant if he had planned to use the gun, to which the Defendant replied, "[Y]eah, I was going to shoot y'all especially if you started shooting at me[.] I knew I was going to prison for a long time so I was going to make it bad." [Tr. at 36]

On cross-examination, Officer Hanshew agreed that he did not record this statement. [Tr. at 72] Officer Hanshew testified that he did not include this statement from the Defendant in his police incident report, but he did include it in a "statement" he wrote just after completing the police report. [Tr. at 76] He estimated that he completed the police report at 8:00 a.m. and the statement at 8:50 a.m. [Tr. at 78] He said that after he told Detective Lodwick what the Defendant had said during the trip to the Justice Center, Detective Lodwick told him to be sure to write a statement setting out what the Defendant had told him. [Tr. at 77] On redirect examination, Officer Hanshew agreed that when he filled out a police incident report, he did not include every relevant detail. [Tr. at 78-79]

The Court finds that the Defendant made the statement to Officer Hanshew during the trip to the Justice Center. Again, the Defendant failed to present any evidence, including Officer Hanshew's police incident report or statement, to contradict Officer Hanshew's positive testimony that this statement occurred.

The Court also finds that Officer Hanshew did not advise the Defendant of the Miranda warnings again, immediately before the Defendant made the statement during transport. On the other hand, the Court finds, and the Defendant concedes, that he received his Miranda warnings and had waived them by executing a rights waiver, earlier that morning. The rights waiver was executed at 4:15 a.m., and Officer Hanshew's police incident report was completed around 8:00

34

a.m.  Thus, the Court finds that the final statement during transport occurred within three and one-half hours of the Defendant's execution of the rights.  In light of these circumstances, the Court finds that ordinarily a defendant would not need to be re-advised of the <u>Miranda</u> rights.  Once a defendant has received the <u>Miranda</u> warnings and has understood them, "[p]olice are not required to rewarn suspects from time to time."  <u>Berghuis v. Thompkins</u>, 130 S. Ct. 2250, 2263 (2010) (affirming admissibility of statement made three hours after the defendant had been given the <u>Miranda</u> warnings).

However, this case differs from the ordinary course because the Defendant also invoked his right to remain silent in ending his interview with Detective Lodwick.  Thus, the Court must assess the voluntariness of the final statement in light of the fact that and the reason that the Defendant had ended the earlier interview with Detective Lodwick.  In examining whether a defendant's answer to questions, after nearly three hours of silence, constitutes a <u>Miranda</u> waiver, the Supreme Court held that

> [t]he <u>Miranda</u> rule and its requirements are met if a suspect receives adequate <u>Miranda</u> warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions.  Any waiver, express or implied, may be contradicted by an invocation at any time.  If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease.

<u>Thompkins</u>, 130 S. Ct. at 2263-64.  In the present case, the Defendant had invoked his right to remain silent by ending the interview with Detective Lodwick.  In <u>Michigan v. Mosley</u>, the Supreme Court analyzed under what circumstances police could resume questioning, after a defendant had invoked his or her right to remain silent.  423 U.S. 96, 101-02 (1975).  The Court concluded that "the

admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Id. at 104. Thus, the Court determined that the statement at issue was admissible because law enforcement had "immediately ceased the interrogation [after the defendant had invoked his right to remain silent], resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." Id. at 106. None of these aspects of the Mosley case are alone determinative, nor is this list exhaustive. Fleming v. Metrish, 556 F.3d 520, 529 (6th Cir.), cert. denied, Fleming v. Rapelje, 130 S. Ct. 103 (2009). Instead, the central inquiry is whether the police acted in an effort to wear down the defendant's resolve to remain silent. Davie v. Mitchell, 547 F.3d 297, 309 (6th 2008).

In the present case, Detective Lodwick did not continue to question the Defendant once the Defendant stated that he wanted to end the interview but, instead, stopped the interview and had the Defendant transported to the Justice Center. Officer Hanshaw, however, questioned the Defendant within a brief time of the interview's conclusion, did not provide the Miranda warnings anew, and questioned him about the gun that was the implement of the robbery about which Detective Lodwick was questioning the Defendant. Although the Court has no evidence with regard to whether Officer Hanshew knew that the Defendant had invoked his right to remain silent to Detective Lodwick, Officer Hanshew's testimony indicates that he knew that Detective Lodwick interviewed the Defendant at the DPD before he transported him to the Justice Center. [Tr. at 35-36] Also, Detective Lodwick's testimony reveals that he knew that Officer Hanshew would be transporting the Defendant to the Justice Center. [Tr. at 91] Thus, the opportunity for the officers

to exchange that information was clearly present. Accordingly, the Court finds that the Defendant's invocation of his right to remain silent was not "scrupulously honored" by Officer Hanshew. As such, the Court finds that the final statement made to Officer Hanshew in the police car during transport should be suppressed.[7]

---

[7]Although the Government's brief urges the Court to undertake an analysis under <u>Herring v. United States</u>, 129 S.Ct. 695 (2009), the Court has found no Fourth Amendment violation, and <u>Herring</u> does not apply to Fifth Amendment violations.

## IV. CONCLUSION

After carefully considering the evidence, the parties' arguments, and the relevant legal authorities, the Court finds no basis to suppress the evidence gained from the stop and search of the Defendant or the search of the truck in which the Defendant was a passenger. Moreover, the Court finds that all but one of the Defendant's statements were made voluntarily. For the reasons set forth herein, it is **RECOMMENDED** that Defendant's Motion to Suppress [**Doc. 17**] be **GRANTED in part**, in that the statement made to Officer Hanshew while the Defendant was being transported to the Jefferson County Justice Center should be suppressed and that the Motion to Suppress be **DENIED** in all other respects.[8]

Respectfully submitted,

   s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[8]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).